CHARLES BUCKEN v. SOUTH AND WESTERN RAILWAY COMPANY.

(Filed 20 December, 1911.)

1. **Master and Servant—Servant's Torts—Scope of Employment—Respondeat Superior.**

　　The master is not responsible for the tort of his servant when done without his authority and not for the purpose of executing his orders or doing the work, but wholly for the servant's own purposes and in the pursuit of his private or personal ends.

2. **Same—False Imprisonment—Assault and Battery—Evidence—Questions for Jury.**

　　In this action to recover damages for false imprisonment, and assault and battery, alleged to have been received at the hands of defendant's agents, there is sufficient evidence that the acts complained of were done in the furtherance of the master's work for the application of the doctrine of *respondeat superior*.

3. **Appeal and Error—Case Agreed—Stenographer's Notes.**

　　An agreement by counsel that the record proper and stenographer's notes shall constitute the case on appeal will not be considered by the Supreme Court, as such is in direct violation of Rule 22. *Cressler v. Asheville*, 138 N. C., 483, cited and applied.

APPEAL from *Lane, J.,* at November Term, 1911, of BUNCOMBE.

Civil action brought to recover damages for false imprisonment, assault and battery, and other wrongs alleged to have been

received at hands of defendant's agents. At conclusion of the evidence his Honor sustained motion to nonsuit, and plaintiff appealed.

*Tucker & Lee and W. T. Morgan for plaintiff.*

*Locke Craig, A. Hall Johnston, and J. Norment Powell for defendants.*

BROWN, J. This appeal is *in forma pauperis* and comprises 134 typewritten pages, of which 110 pages comprise the evidence in chief, cross-examinations and reëxaminations as taken down by the stenographer in the form of question and answer. The defendant offered no evidence and the witnesses for plaintiff were few in number. At the end of the stenographer's notes is this entry: "It is agreed that the record proper and stenographer's notes shall constitute case on appeal." There is no other attempt to make out a case on appeal, as required by law. This is in direct violation of the rule of this Court, No. 22, and of its express decision in *Cressler v. Asheville,* 138 N. C., 483.

That such of the evidence as is necessary to present the assignments of error could easily have been stated in condensed narrative form is manifested by the fact that the counsel for plaintiff and defendants have set out in their respective briefs very clear and brief statements of the evidence, which substantially agree.

Under the circumstances of this case we will make an exception and not dismiss the appeal, but we will be compelled to do so in the future unless our rule is observed.

We have been saved the great labor of a close perusal of this bulky transcript by adopting practically the facts as stated in defendant's brief, as follows: "In February, 1906, the defendants, Carolina Company and South and Western Railway Company (no question being made in this case as to their relation to each other or to the work), were engaged in grading and constructing a line of railway through McDowell County, employing several thousand men at different camps. During that month plaintiff, then at Spartanburg, S. C., was employed by one Redericks to work on said road. In company with others, he went from Spartanburg via Asheville, to Marion, walked nine or ten miles from Marion to Camp 9, where he was told by Captain Harris

(who the evidence shows was superintendent at Camps 8 and 9) that he was not needed at Camp 9, and directed to go to Camp 8. Plaintiff thereupon walked to Camp 8, three miles distant, reached there late in the day, had his name given to the walking boss there, was employed at Camp 8, made arrangements to go to work there, and the next morning went to work and worked half a day, and then, in company with Wheeler and Wyatt, two of the men who had come with him, started home, carrying his baggage. When about midway on the road to Camp 9, they were met by two men, one of whom they identify as Captain Harris. Harris drew a pistol on Wheeler and the other man drew a pistol on plaintiff and Wyatt, and all were commanded to throw up their hands, which they did. Harris then asked where they were going, and, upon being informed that they were going home, told them to go back to Camp 8, which they refused to do. Thereupon Harris asked their reason, and they answered that it had been misrepresented to them. Harris then said that Redericks was at Camp 9 and they would go down and see whether he misrepresented things or not. Harris and the other man rode behind them, Harris cursing them all the way, with his pistol drawn, and upon their arrival at Camp 9, Harris called to a man, 'Sheriff, here are some more hoboes,' and directed the man whom he called sheriff to put them in one of the overseer's houses that had a sufficient lock on it. The evidence shows that the man addressed as 'sheriff' was George Carson, and that he was a walking boss or camp superintendent of one of the defendants at Camp 9, with authority to employ and discharge men at that camp.

"This man thereupon told plaintiff and his two companions to consider themselves under arrest, searched them, took their money, valuables and baggage, and drove them before him with drawn pistol to a room, where he locked them up. Some time that night plaintiff was called to the door by this man, who drew a sack over his head and, with others not identified, led, dragged, and kicked him some distance from the house, flogged him severely, ordered him to leave, fired off pistols and ran him away from the camp. As a result of this cruel treatment, plaintiff was severely and permanently injured."

The defense is that the defendants are not liable for the acts of their superintendent and other agents, as such acts were beyond the scope of their authority. The facts as stated by the defendants' counsel show a degree of severity, abuse, and violation of law which should bring upon the servants of defendants who committed them the punishment of the criminal law. As stated by plaintiff's brief, they disclose a degree of brutality almost unbelievable.

In addition to the statement copied from defendants' brief, the evidence tends to prove that the defendants were engaged in building the railroad, and no question as to an independent contractor is raised. One Fred. Rederick was defendants' labor agent employed to secure laborers for defendants, and in such capacity he employed plaintiff and furnished his transportation to defendants' camps, and there some little provisions, etc., were advanced him. Harris was the superintendent of the work of construction and in control of the labor camps and laborers. Carson and Foster were the walking bosses at camps and had absolute control in superintendent's absence. The arrest was made by the superintendent of defendants while about his master's business, and in the furtherance of the interests of the master, the evident purpose of the arrest being to force the plaintiff to return to work and pay his transportation. When the pistols were leveled at plaintiff, the purpose of the arrest was then and there made known by the superintendent: "He told us that we would have to go back to Camp 8; that we were not going to leave there"; "Go back up there, and go quick"; "Go on back up there and pay your transportation"; "We don't owe any transportation"; "Oh, yes, you do, damn you, and you will go back and pay it," etc. Harris had charge of both Camps 8 and 9, and while on duty and looking after his master's interests, and not for any purposes of his own, he took plaintiff under arrest and held him helplessly imprisoned until he was taken out and beaten that night.

It is contended, and it may be inferred from the evidence, that the very room in which plaintiff was confined was constructed by defendants for prison purposes in order to enforce

obedience to the commands of its superintendent and foreman, and to prevent escapes.

We recognize the well-established rule that the master is not responsible for the tort of his servant when done without his authority and not for the purpose of executing his orders or doing his work, but wholly for the servant's own purposes and in pursuit of his private and personal ends. But that is not the only inference that can be drawn from the evidence in this case. There is nothing to show that Harris and Carson had any private ends of their own to pursue or that they had quit sight of the company's work and were following the suggestions of their own malice. On the contrary, the evidence shows that they assaulted and imprisoned plaintiff to force him to pay the alleged debt to the company and to compel him to work against his will on the company's road.

This question has been very elaborately discussed in several recent opinions of this Court, and it is useless to "thresh over old straw."

The principles laid down in *Jackson v. Telegraph Co.,* 139 N. C., 353; *May v. Telegraph Co., ante,* 416; *Berry v. R. R.,* 155 N. C., 287, are clearly applicable to the facts of this case as now appearing.

The subject is also fully discussed, and distinctions drawn in *Daniel v. R. R.,* 136 N. C., 527; *Sawyer v. R. R.,* 142 N. C., 1; *Stewart v. Lumber Co.,* 146 N. C., 49; *Marlowe v. Bland,* 154 N. C., 140, and *Dover v. Manufacturing Co., ante,* 324; *Roberts v. R. R.,* 143 N. C., 180.

His Honor should have submitted the issues to the jury under appropriate instructions.

The judgment of nonsuit is set aside.

New trial.